# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FRED D. CARVER,**
        **Plaintiff,**

v.
                             **CIVIL ACTION NO. 1:04CV190**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF**
**SOCIAL SECURITY,**
        **Defendant**.

## REPORT AND RECOMMENDATION/OPINION

Plaintiff brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross Motions for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B).

## I. Procedural History

Fred. D. Carver ("Plaintiff") filed his application for DIB on January 24, 2002 (protective filing date), alleging disability as of May 15, 2001, due to gout in his ankles and left eye blindness (R. 77). The application was denied initially and on reconsideration (R. 33, 39). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") Donald McDougall held on April 22, 2003 (R. 278). Plaintiff, represented by counsel, testified along with Vocational Expert Dr. Larry Ostrowski ("VE"). The ALJ rendered a decision on July 25, 2003, finding that Plaintiff was not under a "disability," as defined in the Social Security Act, at any time through the date of the decision (R. 24). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final

decision of the Commissioner (R. 5).

## II. Statement of Facts

Plaintiff was born on August 23, 1949, and was nearly 54 years old on the date of the ALJ's decision (R. 51, 73). He has a high school education and past work as a maintenance man, welder, and truck driver (R. 86). He last worked in May 2001.

On April 24, 2002, Plaintiff presented to Bennett D. Orvik, M.D., for a Disability Determination Evaluation upon referral by the State agency (R. 126). Plaintiff complained mainly of progressive loss of vision in the left eye and significant pain and swelling of the ankles. He stated he had been diagnosed with gout. He had been treated with medications which helped, but did not have a current prescription and could not afford the medication. Prolonged standing, stooping or walking bothered his ankles. Plaintiff reported his alcohol use as drinking approximately a case of beer per week. He smoked two packs of cigarettes per day, and denied drug abuse (R. 128).

Physical examination showed greatly decreased breath sounds throughout the lungs (R. 130). His extremities were normal in appearance, pulses were normal and there was no peripheral edema, inflammation, ulceration, discoloration, clubbing, deformity or cyanosis of the extremities. There was no loss of sensation, and muscle strength was normal. Straight leg raising was normal, and there were no areas of muscular atrophy. Range of motion was within normal limits except for a decrease in the knee and ankle due to joint stiffness. There were no areas of inflammation, tenderness, swelling or deformity. Gait and stance were normal. He could walk on his heels without difficulty but had difficultly walking on his toes due to ankle pain. He arose from a squat without difficulty, but squatted with some difficulty due to ankle pain. He got on and off the examining table without any difficulty. He wrote and picked up small objects without difficulty.

2

Dr. Orvik diagnosed ankle arthritis apparently secondary to recurrent gout; left visual loss apparently secondary to dense cataract; and probable significant chronic obstructive pulmonary disease ("COPD"). Dr. Orvik summarized:

> He is actually able to do a large number of things. He could talk on the phone without difficulty. He does not have any typing or computer skills. His abilities would be somewhat decreased by the fact that he has a significant loss of vision in his left eye, but that is probably a correctable problem.

Pulmonary Function Studies performed May 23, 2002, indicated Plaintiff had moderate COPD (R. 135-137).

In a report dated May 28, 2002, G. Benjamin Baker, Plaintiff's treating Certified Physicians' Assistant, noted that Plaintiff had bilateral cataracts and gout (R. 140). He also noted Plaintiff had no distant vision in his left eye, decreased vision in his right eye, and bilateral diffuse expiratory wheezing. He opined Plaintiff would be unable to work due to his vision. He then opined that Plaintiff should avoid night work, uneven surfaces, driving, and operating heavy equipment. Dr. Baker noted Plaintiff had alcohol on his breath at the time of the examination.

On July 12, 2002, chest x-rays indicated Plaintiff had emphysematous chest without acute pathology (R. 201). The lungs were clear of infiltrates.

On August 8, 2002, State agency reviewing psychologist Samuel Goots, Ph.D., completed a Psychiatric Review Technique ("PRT"), opining Plaintiff had no medically determinable mental impairment (R. 157).

On October 24, 2002, Plaintiff presented to United Summit Center for complaints of anxiety, agoraphobia, panic attacks, and depression (R. 189). He said these problems had intensified over the past 6-8 months. He found it very difficult to go to a store or be around people. He also reported

being very forgetful and unable to concentrate. He was diagnosed with Panic Disorder with Agoraphobia and Major Depressive Disorder, single episode.

On October 29, 2002, Plaintiff presented for a neuropsychological evaluation at United Summit Center (R. 262). He denied any history of diagnosed neurological disorder. His history was significant for use of LSD and marijuana, and several concussions per his own report, two from football and two from fights. He also reported several toxic exposures to drain cleaners and paint. He was currently being treated for depression and anxiety and was taking Zoloft and Zyprexa. The psychologist summarized his findings as follows:

> Mr. Carver presented with severe depressive symptoms as well as anxiety with agoraphobic symptoms. His anxiety and agoraphobia symptoms were mild in comparison to his reports of depression at the time of this evaluation and did not seem to meet severity criteria for a diagnosis separate from his depression for this current report.

(R. 265).

Dr. Sharp diagnosed Plaintiff with "Major Depressive Disorder, Single episode, Severe, With Psychotic Features" (R. 265). He opined Plaintiff's GAF would be 45.[1]

On December 7, 2002, Plaintiff presented for a psychiatric evaluation at United Summit Center with Srinivas Yerneni, M.D. (R. 267). Again Plaintiff admitted to having used LSD on a nearly daily basis 20 years earlier. He "initially stated that the last time he used marijuana was one month ago but later stated he had used Lorazepam, marijuana and alcohol one week ago." He drank at least once a week, consuming up to a twelve pack or at least a bottle of whiskey. He had tried

---

[1]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

cocaine four or five years earlier, and also tried Oxycontin and Ativan "whenever his cousin had a supply of this." He currently smoked two packs of cigarettes per day. Mental Status Examination showed Plaintiff had difficulty with concentration and calculation ability. He had decreased insight and judgment. He appeared to have some paranoia, especially around people. Memory was 0 out of 3 at three minutes. He was questionable for hallucinations.

The psychiatrist diagnosed Plaintiff with Major Depressive Disorder with Psychotic Features vs. Substance Induced Mood Disorder; Agoraphobia; Nicotine Dependence; Rule Out Schizoaffective Disorder; and "Polysubstance Dependance (Benzo's [sic], Opioid, Alcohol, Marijuana, Cocaine and LSD, Nicotine)" (R. 265). His GAF was determined to be 60-65.[2]

Dr. Yerneni opined:

It is difficult at this time [to determine] whether the patient has a primary psychiatric condition or it is substance-induced. Patient however appears to be suffering quite a bit from depressive features as well as increased anxiety in crowded places, is also complaining of decreased sleep and decreased appetite and hearing voices. For these above reasons I will start the patient on Zyprexa 10 mg. q.b.s. Patient was informed of the need for sobriety. Patient stated that he does not have a drug problem and that he will be able to stay sober. Patient is exhibiting poor insight into possible causation of his condition. I had offered patient to do drug testing as well as other routine labs but he stated that he cannot afford to have such testing done. The medication is started today due to the severity of his symptoms. Patient was explained the side affects [sic] of Zyprexa including possible weight gain, sedation, elevated cholestrol [sic] and possible increase in glucose intolerance. Patient was also educated of the possible causation of his race as well as due to the fact that he

_____

[2]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

is male. Stated that he was aware that Native-Americans had a higher incident of alcoholism. If patient fails to stay sober he may benefit from outpatient drug rehab program if not an inpatient program. Patient is to follow up in three weeks time.

(R. 269).

On December 28, 2002, Plaintiff told Dr. Yemeni his sleep was better and he was eating better, but he was still having difficulty going outside and being with people (R. 182). He continued to have a depressed mood. He denied using drugs or alcohol. He was applying for a medical card. He did not smell of alcohol. His mood was "skittish" and his affect was brighter. He still heard "mumbling," but less than at the last visit. He was more coherent and his speech was at a good rate and volume. Dr. Yemeni diagnosed Major Depressive Disorder with Psychotic Features; Polysubstance Dependency in Partial Remission; Agoraphobia with Panic Attacks; and Rule Out Schizoaffective Disorder. He increased Plaintiff's Zyprexa and gave him samples of the medication.

On January 25, 2003, Plaintiff told Dr. Yemeni the medication helped with his insomnia (R. 270). He continued to report increased anxiety and fear of being in crowds. He also continued to feel "down." He denied using any drugs. Dr. Yemeni diagnosed Major Depressive Disorder with Psychotic Features – Slight Improvement; Polysubstance Dependency By History – In Remission; and Agoraphobia – Unchanged. He again increased Plaintiff's Zyprexa and added Zoloft.

On February 4, 2003, Plaintiff was referred by his attorney for a psychological evaluation performed by supervised psychologist Frances Allen-Henderson under the supervision of L. Andrew Steward, Ph.D. (R. 225). Plaintiff complained of "being real nervous around people" and "hearing voices at night . . . like conversations, but you can't tell what it is" (R. 225). He reported his only

6

restriction as "not to eat stuff . . . everything I like." He was currently prescribed Zoloft and Xanax.

Plaintiff denied a history of substance abuse or drug treatment (R. 227). He reported he liked to fish, but only by himself (R. 228). He had problems seeing, but could cook simple meals and could drive short distances. He did not drive long distances or at night. He reported sleeping better with medications, and reported losing 30-40 pounds. He reported his concentration was poor and he did not have any staying power anymore, meaning he gave up easily and his energy level was "low."

Testing showed Plaintiff's intelligence was low average. Mental Status Examination showed his attention was average, immediate memory was average, and long-term memory was intact. Short term memory was impaired, concentration was below average, and psychomotor activity and eye contact were both significantly below average. Social judgment was average. His reported mood was "down a little bit," while his observed mood was depressed and anxious. His affect was constricted. There was no evidence of psychosis and he denied suicidal/homicidal intent. His IQ scores ranged between 79 and 88. His spelling, reading, and arithmetic tested at the fourth, sixth, and sixth grades, respectively.

The evaluator considered the results of Plaintiff's Personality testing to be invalid, but opined: "It appears as if Mr. Carver may have had difficulty understanding the items on the instrument although he was given the audiotaped version of the instrument. This could be due to his low reading level or inability to comprehend" (R. 230). Regardless of the explanation, the results were un-interpretable or of little value.

The Beck Depression Inventory indicated mild depression. The Beck Anxiety Inventory reflected moderate anxiety (R. 231). The Beck Hopelessness Survey indicated mild hopelessness.

The visual motor gestalt test suggested an organic or neurological problem, but the examiner opined it may also have been a result of his vision problems.

The psychologists diagnosed Panic Disorder with Agoraphobia; Adjustment Disorder with Mild Depression; and Disorder of Written Expression. His GAF was 62. They noted Plaintiff reported a past history of panic disorder with agoraphobia and depression, but that there was not a legible medical record to support this. They also noted, however, that his prescribed medication was often used to treat these problems. Although he appeared to be experiencing some depression as a result of his medical problems and life change, he also indicated his medication had brought him some relief.

Psychologists Henderson and Steward completed a Psychiatric Review Technique ("PRT"), opining that Plaintiff had an organic mental disorder consisting of a memory impairment; a depressive disorder; and an anxiety -related disorder (R. 233). They found no substance addiction disorder. They found he would have a moderate restriction of daily activities, partly due to his poor eyesight; moderate difficulties maintaining social functioning; moderate difficulties maintaining concentration, persistence or pace; and one or two repeated episodes of decompensation (R. 243).

The psychologists also completed Mental Residual Functional Capacity Assessment ("RFC"), opining Plaintiff would have moderate limitations in understanding, remembering, and carrying out detailed or even short, simple instructions; sustaining concentration and attention for extended periods; maintaining regular attendance and punctuality; completing a normal workday and workweek without interruption from psychological symptoms; performing at a consistent pace without an unreasonable number and length of work breaks; interacting appropriately with the public; working in co-ordination with others without unduly distracting them; demonstrating

8

reliability; and responding to changes in the work setting or work processes.

In March 2003, Dr Yerneni assisted Plaintiff in filling out his disability papers. Plaintiff stated he had run out of Zyprexa and Zoloft because he missed his last appointment (he was still being provided free samples). He did note the medications helped him sleep well. He admitted to drinking two nights earlier, stating he had two beers to help him sleep, saying, "2 beers won't hurt anything, will it?" Dr. Yerneni noted Plaintiff smelled "heavily" of alcohol, although he denied drinking that day. He used two breath mints while there. Dr. Yerneni found Plaintiff had poor insight and judgment and diagnosed Polysubstance Dependency with Alcohol Use; and Major Depressive Disorder with Psychotic Features. He advised Plaintiff of the importance of abstinence and the interaction of alcohol with his medications and warned his treatment would be terminated if he continued to use alcohol or drugs.

On March 8, 2003, Dr. Yerneni completed a Mental Residual Functional Capacity Assessment ("RFC"), opining Plaintiff would have a marked limitation in understanding, remembering and carrying out detailed instructions; interacting appropriately with the public; responding appropriately to direction and criticism from supervisors; working in co-ordination with others without being unduly distracted by them; demonstrating reliability; and ability to be aware of normal hazards (R. 206-209). He would have a moderate limitation in his ability to understand, remember, and carry out short, simple instructions; exercise judgment or make simple work-related decisions; sustain attention and concentration for extended periods; maintain regular attendance and punctuality; complete a normal workday and workweek without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of work breaks; work in co-ordination with others without unduly distracting them; maintain acceptable

standards of grooming and hygiene; maintain acceptable standards of courtesy and behavior; relate predictably in social situations in the workplace without exhibiting behavioral extremes; ask simple questions or request assistance from co-workers or supervisors; respond to changes in the work setting or work processes; carry out ordinary work routines without special supervision; set realistic goals and make plans independently of others; travel independently in unfamiliar places; and tolerate ordinary work stress (R. 209).

Many of the limitations Dr. Yerneni found were based on either poor insight and judgment or the possibility that he would be "under the influence." Dr. Yerneni expressly noted on the form: "With continued drug and ETOH use, Pt.'s judgment can only continue to be impaired and may have diff. following instructions." He expressly found Plaintiff's limitations in responding to changes in the work setting and his marked limitation in ability to be aware of normal hazards and take appropriate precautions were due to: "If under influence, Pt.'s judgment would be impaired." He expressly noted Plaintiff's limitations in attention, concentration, persistence, work pace, keeping to a work schedule, and following normal work routines were due to: "If under the influence, Pt. would have difficulty [with] regular attendance [and] on job performance" (R. 207).

On March 22, 2003, Plaintiff was 20 minutes late for his appointment with Dr. Yerneni (R. 272). The doctor noted he had been seen staggering in by the receptionist. He again smelled heavily of alcohol but denied consuming alcohol. He was instructed not to drink and drive. He was also instructed that the doctor would not continue to treat him if he continued to drink. He was given a weeks' supply of Zyprexa and a sample pack of Zoloft.

On April 12, 2003, Plaintiff told Dr. Yerneni he had not had any alcohol since his last visit (R. 273). He felt the medications were helping, and he was able to leave the house with less anxiety.

10

Dr. Yemeni noted he did not smell of alcohol on this date and had less slurring of speech. His mood was pretty good and his affect was brighter. Dr. Yemeni diagnosed Major Depressive Disorder with Psychotic Features- improved with less alcohol consumption and better medication compliance. He still diagnosed Alcohol Abuse/Dependency. He recommended AA and NA meetings, but Plaintiff refused.

On April 7, 2003, Plaintiff's treating Physician's Assistant Baker performed a physical examination for the State agency (R. 257). He diagnosed Plaintiff with emphysema, gout, and bilateral cataracts (R. 257). He scheduled a pulmonary function test, and gave him samples of Advair. He declined a prescription due to an inability to afford it.

On April 15, 2003, Physicians' Assistant Baker completed a State Department of Human Services Physician's Summary stating Plaintiff was diagnosed with bilateral cataracts, emphysema, and gout (R. 255). Upon examination, Plaintiff had bilateral diffuse expiratory wheezing and inspiratory crackles (R. 256). Mr. Baker deferred any prognosis of the cataracts to an ophthalmologist, and opined the gout could be controlled with prescription medication and diet. He opined the emphysema was unlikely to improve, however. He opined Plaintiff's incapacity/disability was likely to be permanent. He opined Plaintiff could not drive, operate heavy equipment, exercise for prolonged periods, stand for 25 minutes, work in cold or damp air or work in an environment with dust particles.

The ALJ asked the VE a hypothetical with the following limitations: The hypothetical individual could do light work, but had almost no vision in the left eye. The job must therefore require no depth perception or good peripheral vision. It should not involve work around significant noises or in close proximity to or in close coordination with more than four co-workers or

supervisors who would generally remain the same. It must not involve driving, work with the general public or fast-paced or assembly-line work (R. 317). The VE testified the hypothetical individual could work as a hand packer, housekeeper/cleaner or mail clerk (R. 318).

Plaintiff's counsel added to the hypothetical limitations on working around cold , damp or dusty or polluted areas, standing for more than 25 minutes at a time, and prolonged exercise. The VE testified these additional limitations would preclude any work.

### III. Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527).

7. The claimant has the following residual functional capacity: exertionally, he can sit up to six hours and stand and walk up to six hours in an eight-hour workday, and lift weights of up to 50 pounds occasionally and up to 25 pounds frequently. Nonexertionally due to visual deficits he has impaired

depth perception and peripheral vision and cannot drive as part of a job. Due to his psychiatric conditions he cannot work around significant noise in the work place; cannot work in close proximity to or in close coordination with more than four co-workers or supervisors who would generally remain the same; cannot work around the general public; cannot perform fast-paced or assembly line work; is limited to jobs entailing one to three step instructions; and must be able to miss up to two days of work per month.

8.      The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

9.      The claimant is 53 years old, or an "individual closely approaching advanced age" (20 CFR § 404.1563).

10.      The claimant has a high school education (20 CFR § 404.1564).

11.      The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 404.1567).

12.      Although the claimant's exertional and nonexertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.22 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples include light jobs as a hand packer (139 regionally and 215,300 nationally), a housekeeper/cleaner (341 regionally and 254,500 nationally), or a mail clerk (39 regionally and 51,300 nationally).

13.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR 404.1520(e)).

(R. 23-24).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo

review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1.  The ALJ erred in inferring that Plaintiff's lack of medical treatment due to lack of finances indicated that his conditions were not serious or severe;

2.  The ALJ erred in failing to find that Mr. Carver's impairments of gout/arthritis in both ankles, left eye blindness due to cataracts, COPD, and mental impairments were individually severe and by further failing to then consider whether in combination those individually severe impairments met or equaled a listing, or further combined to constitute a disability within the meaning of 42 USCA § 423;

3.  The ALJ exceeded his area of expertise by substituting his opinion and judgment for that of the treating psychiatrist and the examining psychologist, Cardinal Psychological Service;

4.  The ALJ should have ordered a consultative examination to resolve the conflict in the evidence of the treating and examining sources and that of the non examining DDS source, Dr. Goots;

5.  In formulating the basis of his decision denying benefits, the ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE; and

6.  The ALJ did not follow the mandates of SSR 96-7p when determining the issues of pain and credibility.

Defendant contends:

1.  The ALJ never stated that Plaintiff's condition was neither not severe nor not serious [sic] due solely to a lack of treatment caused by a purported lack of finances.

2.  The ALJ determined the combined impact of Plaintiff's impairments did not meet or medically equal an impairment listed in Appendix 1.

3.  The ALJ considered any medical opinion that was a statement from an acceptable medical source which reflected a judgment about the nature and severity of Plaintiff's impairments and their resulting limitations, pursuant to the criteria set forth in 20 C.F.R. § 404.1527;

4.  It was the ALJ, as trier-of-fact, who was charged with the resolution of the conflicts in the evidence;

5.  The ALJ properly determined neither Dr. Andrews' or Dr. Yerneni's opinions formed the basis for a proper hypothetical question; and

6.  The ALJ conducted the 2-step analysis required by § 404.1529(b)-(c) and SSR 96-7p.

### C. Severe Impairments

Plaintiff argues: "The ALJ erred in failing to find his impairments of gout/arthritis in both ankles, left eye blindness due to cataracts, COPD and Mental Impairments were individually severe and by further failing to then consider whether in combination those individually severe impairments met or equaled a Listing, or further combined to constitute a disability." This statement is partly correct. The ALJ did find Plaintiff's gout/arthritis affecting the ankles, anxiety, depression, and left eye cataract were severe individually as well as in combination (R. 18). He did not, however, find Plaintiff's COPD to be a severe impairment. His reasons for this finding are as follows:

> The medical evidence contains test results showing moderate chronic obstructive pulmonary disease and Dr. Baker suggested the claimant avoid cold temperature and dust. Despite this diagnosis and functional restrictions, the claimant admittedly has smoked up to two packs of cigarettes per day and now smokes nearly a pack per day, and even admitted that he does yardwork (mows the lawn). There is no indication in the record that he takes any medication for respiratory symptoms. In view of the claimant's admitted activities and the absence of evidence of medical care for respiratory dysfunction, it is concluded that this condition has no effect on his ability to function, and does not warrant any further evaluation herein.

This finding does not comport with Fourth Circuit law for several reasons. First, the fact that Plaintiff still smokes, although regrettable, is not a proper basis for finding his COPD is not severe. There is as yet no Fourth Circuit law stating that continuing to smoke equates with having no severe breathing impairment. In *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit cited cases in which "[f]ailure to quit smoking has been held to be a justifiable grounds for refusing benefits" (*citing Henry v. Gardner*, 381 F.2d 191 (6th Cir. 1967)); *Hirst v. Gardner*, 365 F.2d 125 (7th Cir. 1966)), as well as "some recent cases [that] have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking *(i.e.*, was not addicted to cigarettes)." *Id. (citing Monteer v. Schweiker*, 551 F.Supp. 384 (W.D.Mo. 1982); *Caprin v. Harris*, 511 F.Supp. 589 (N.D.N.Y. 1981)). The court then held:

> The Secretary may only deny the claimant benefits because of . . . tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking . . . and the claimant is able voluntarily to stop.

*Id.* Second, Plaintiff testified he could not afford prescription medications. This is consistent with the record, which clearly shows he took samples of prescription medications for his breathing impairments but refused a prescription due to his inability to pay for it. His medications for mental impairments were also free samples, provided by his treating psychiatrist. Lack of treatment due to financial inability to pay is more fully discussed later in this decision. Third, although Plaintiff did

testify he mowed his lawn using a riding mower, he also testified his lawn was only about 50x25 feet. The ALJ simply does not explain why mowing a small lawn with a riding mower is evidence a claimant does not have a severe breathing impairment.

Defendant also argues: "Although Mr. Baker suggested Plaintiff should avoid cold temperatures and dust . . ., Plaintiff submitted no evidence which suggested Mr. Baker was an acceptable medical source . . . ." The undersigned notes that the ALJ referred to him as Dr. Baker in his decision and clearly considered him an acceptable medical source. The undersigned finds Mr. Baker, a Certified Physicians' Assistant, is actually not an acceptable medical source as defined in 20 C.F.R. § 404.1513(a). The ALJ's error in this regard is harmless, however, because physicians' assistants are expressly recognized in the Regulation as an "other source" of evidence to show the severity of impairments and how they affect a claimant's ability to work. Further, the original diagnosis of COPD was actually made by Dr. Orvik, an M.D. to whom Plaintiff was sent by the State agency. This diagnosis was confirmed by a chest x-ray and pulmonary function studies showing moderate chronic COPD.

For all the above reasons the undersigned finds substantial evidence does not support the ALJ's determination that Plaintiff's moderate COPD was not a severe impairment.

Even if Plaintiff's COPD was properly determined not to be a severe impairment, it was clearly a medically determinable impairment the ALJ was required to consider throughout the remaining steps of the sequential analysis. 20 C.F.R. § 404.1520(a)(4). 42 U.S.C. § 423(d)(2)(B) and 42 U.S.C. § 1382(c)(a)(3)(F) provide:

> In determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social

Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

(Emphasis added). In this regard Defendant argues:

[B]ecause Plaintiff had these severe impairments [gout/arthritis, left eye loss of vision, and mental impairments], the ALJ advised that he considered all of Plaintiff's medically determinable impairments in the remaining steps of the sequential evaluation process set forth at 20 C.F.R. § 404.1520(a)(4)(2004)(Tr. 17). The ALJ acknowledged the medical evidence showed Plaintiff had moderate COPD (Tr. 18) which meant the ALJ considered Plaintiff's COPD in the remaining steps of the sequential evaluation process.

(Defendant's brief at 8). This argument is totally baseless. A review of the decision shows the ALJ clearly did not consider COPD in the remaining steps of the sequential evaluation process, and, in fact, expressly stated at the second step of the evaluation: "this condition has no effect on his ability to function, and does not warrant any further evaluation herein."

Because the ALJ did not consider Plaintiff's COPD throughout the sequential analysis, it logically follows that he did not properly consider the combined effect of all of Plaintiff's impairments.

### D. Lack of Treatment

Plaintiff argues: "The ALJ erred in inferring that Plaintiff's lack of medical treatment due to lack of finances indicated that his conditions were not serious or severe." Defendant contends "The ALJ never stated that Plaintiff's condition was neither not severe nor not serious [sic] due solely to a lack of treatment caused by a purported lack of finances." A review of the decision, however, shows the ALJ clearly based his determination regarding Plaintiff's COPD and gout/arthritis in large part on his lack of medical care. Yet the record shows Plaintiff took samples

of medication for these condition when available, and refused a prescription only due to his inability to afford it. Notably, he was provided free samples of his Zyprexa and Zoloft, also. Later in the decision, the ALJ stated:

> Due to a lack of funds he uses only nonprescription analgesics for his allegedly severe pain, but this cannot be entirely true as he still buys cigarettes, which with tax increases and the like are more expensive than generic prescription pain relievers.

(R. 19). This statement is without support in the record. Plaintiff admitted he smoked less than a pack a day, down from two packs a day, but testified he rolled his own cigarettes at a cost of about $1.00 per pack. The medications Plaintiff was prescribed for his gout were Probenecid, Ketoprofen, and Colchicine (R. 124-125). The undersigned performed some very rudimentary research and found Probenecid at $34.99 for 60 tablets, Ketoprofen at $13.99 for 60 tablets, and Colchicine at $13.60 for 60 tablets.[3] Contrary to the ALJ's statement, there either was no generic substitute for this medications or these already were generics. Simply put, even if Plaintiff managed to quit smoking entirely, from the record it does not appear he would be able to afford these medications.

Additionally, although the ALJ did find Plaintiff's loss of vision due to cataracts was a severe impairment, he also several times noted that doctors found the impairment could be corrected with surgery. Plaintiff testified he had "no way to pay" for the surgery.

In *Gordon v. Schweiker*, 725 F.2d 231 (4th Cir. 1984), the Fourth Circuit held:

> It flies in the face of the patent purposes of the Social Security Act to deny benefits to someone because he is too poor to obtain medical treatment that may help him.

Interestingly, *Gordon* involved a claimant who alleged disability in part due to cataracts.

---

[3]The undersigned does not mean this to be a finding of fact as regards the price of Plaintiff's prescriptions, but only an example of the research the ALJ could have performed before making his finding. The information was obtained at www.drugstore.com.

The undersigned finds the ALJ did, in large part, base his findings regarding Plaintiff's COPD, pain allegations, and credibility on his failure to obtain treatment. There is no evidence in the record, except for Plaintiff's ability to pay for tobacco and rolling papers, that he could afford such treatment, and the ALJ did not give him to opportunity to show he could not. The undersigned therefore finds substantial evidence does not support the ALJ's determination regarding the severity of Plaintiff's impairments.

## D. Mental Impairments

Plaintiff next argues: "The ALJ exceeded his area of expertise by substituting his opinion and judgment for that of the treating psychiatrist and the examining psychologist, Cardinal Psychological Service." Defendant argues "The ALJ considered any medical opinion that was a statement from an acceptable medical source which reflected a judgment about the nature and severity of Plaintiff's impairments and their resulting limitations, pursuant to the criteria set forth in 20 C.F.R. § 404.1527."

The ALJ found Plaintiff had depression and anxiety, both severe impairments. Plaintiff's treating psychiatrist, Dr. Srinivas Yerneni, diagnosed Plaintiff with Major Depressive Disorder with Psychotic Features vs. Substance Induced Mood Disorder; Rule Out Schizoaffective Disorder; Agoraphobia; Nicotine Dependence; and "Polysubstance Dependance (Benzo's, Opioid, Alcohol, Marijuana, Cocaine and LSD, Nicotine)" (R. 265). On March 8, 2003, Dr. Yerneni completed a PRT, opining Plaintiff had a moderate restriction of activities of daily living; moderate difficulties in maintaining concentration persistence or pace; and moderate to marked difficulties in maintaining social functioning (R. 221). He also completed a Mental RFC, finding Plaintiff had moderate to marked limitations in every area.

The ALJ did not give great weight to these reports because he found Dr. Yemeni was a one-time examiner for the purposes of this litigation with no treating relation and the conclusions were contradicted by other evidence (R. 16). This is clearly an error of fact. A review of the record shows that Dr. Yemeni was Plaintiff's treating psychiatrist. The ALJ even refers to him as the treating psychiatrist earlier in the decision. The record shows Dr. Yemeni saw Plaintiff at least four times before completing the evaluations at issue. Substantial evidence therefore does not support the ALJ's decision to treat Dr. Yemeni as a one-time examiner.

In addition, the ALJ stated:

> In terms of the claimant's psychiatric status, treating and consulting examiners have suggested that the claimant is moderately to markedly limited yet their assessments did not address the effects of his polysubstance abuse despite the fact that he was observed to have alcohol on his breath, and at times either staggered or had slurred speech . . . . Given the clear contradiction between testimony and medical opinions that failed to even note the presence of substance abuse, much less account for it, it must be concluded that those assessment provided incomplete data and may be granted no weight under SSR 96-2p and SSR 00-2p.

(R. 20). Defendant argues:

> The ALJ found cogent that neither Dr. Andrew nor Yemeni had addressed the specific effects Plaintiff's substance abuse had on his ability to work (Tr. 206-10, 247-51). This omission was critical because Dr. Yemeni opined it was difficult to determine whether Plaintiff primarily had a psychiatric condition or a substance-induced condition (Tr. 269) given his history of substance abuse (Tr. 140, 183, 267).

(Defendant's brief at 10)(emphasis added). Both the ALJ's finding and Defendant's argument, however, are again clearly wrong. As already noted, Dr. Yemeni, the only treating psychiatrist, expressly stated in his PRT that Plaintiff had a Substance Addiction Disorder pursuant to Listing 12.09 (R. 219). Dr. Yemeni also clearly attributed many of the limitations contained in his Mental RFC to Plaintiff's drug and alcohol use and even to the possibility he might be "under the influence"

21

or "intoxicated" on the job (R. 207-208).[4]

Further, immediately after his finding regarding Dr. Yerneni's opinion, the ALJ states:

Pursuant to SSR 96-6p, the Commissioner has mandated that the opinions of state agency medical and psychological consultants must be treated as expert opinion evidence from nonexamining sources. The undersigned is not bound by the conclusions of these nonexamining sources (Exhibits 7F and 9F-10F). The undersigned has evaluated and considered these opinions and given them significant, but not controlling, weight in conjunction with other relevant evidence in rendering this decision; these opinions do allow for some work activity.

(R. 17). Notably, Exhibits 9F and 10F are State agency reviewing Psychologist Goots' PRT and

Mental RFC. There is no other State agency psychological consultant's opinion in the record (7F

is a Physical RFC). The only opinion rendered by Dr. Goots, however, is that Plaintiff has no

medically determinable mental impairment at all. The ALJ's statement regarding giving this opinion

significant weight is therefore clearly inconsistent with his own determination regarding Plaintiff's

mental impairments. Further, it is undisputable that Dr. Goots' evaluation was made before Plaintiff

ever sought evaluation or treatment for his alleged mental impairments.

Additionally, the ALJ's determination regarding Plaintiff's drug and alcohol abuse is itself

inconsistent. He first finds Plaintiff's "alcohol and drug abuse in (at most) partial remission" is

severe in combination with his other impairments. He later finds Plaintiff's impairment of "alcohol

and drug abuse" is severe in itself (R. 18). Still later he refers to Plaintiff's "recent history of

polysubstance abuse (in questionable partial remission)." (Emphasis added). Finally, he finds

Plaintiff "has not demonstrated . . . an ability to control his substance abuse," emphasizing that his

doctors noticed alcohol on his breath more than once; that he staggered into his doctor's office and

---

[4]The undersigned notes these pages are within the five pages cited by Defendant in support of her argument.

had slurred speech only six weeks before the hearing; and that he admitted to drinking only weeks before the hearing. Only six weeks before the hearing, treating psychiatrist Dr. Yemeni expressly opined: "If under the influence, Pt. would have difficulty [with] regular attendance [and] on job performance . . . . [and his] judgment would be impaired" to the point where he would have a marked limitation in his ability to be aware of normal hazards and take appropriate precautions (R. 206-208). Yet the only limitations the ALJ found based on mental impairments were as follows:

> Due to his psychiatric conditions of depression and anxiety with a recent history of polysubstance abuse (in questionable partial remission) he cannot work around significant noise in the work place; cannot work in close proximity to or in close coordination with more than four co-workers or supervisors who would generally remain the same; cannot work around the general public; cannot perform fast-paced or assembly line work; is limited to jobs entailing one to three step instructions; and must be able to miss up to two days of work per month.

(R. 21). The undersigned does not find the above limitations consistent with the record and with the ALJ's own determination that Plaintiff could not control his addictions. If not outright disabled, it would seem that a person who staggers into his own doctor's office and cannot control his alcohol and substance abuse should at least be restricted from performing any work around hazards (heights and heavy machinery, for example).[5]

For all the above reasons, the undersigned finds substantial evidence does not support the ALJ's determination regarding Plaintiff's alleged mental impairments.

---

[5]The undersigned is well aware of 42 U.S.C. § 423(d)(2)(C), which provides:

An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

### E. Need for a Consultative Psychological Evaluation

Plaintiff next argues: "The ALJ should have ordered a consultative examination to resolve the conflict in the evidence of the treating and examining sources and that of the non examining DDS source, Dr. Goots." Defendant argues: "It was the ALJ, as trier-of-fact, who was charged with the resolution of the conflicts in the evidence."

Because the undersigned has already found substantial evidence does not support the ALJ's decision regarding Plaintiff's alleged mental impairments, he does not further address this issue.

### F. Hypothetical to the VE

Plaintiff next argues: "In formulating the basis of his decision denying benefits, the ALJ relied upon an incomplete and inadequate hypothetical question posed to the VE." Defendant argues: "The ALJ properly determined neither Dr. Andrews' or Dr. Yemeni's opinions formed the basis for a proper hypothetical question." When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (*citing Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)). If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen*, 672 F. Supp. 230, 235 (E.D.N.C. 1987) (Emphasis added). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

Because the undersigned has already found substantial evidence did not support the ALJ's determination regarding Plaintiff's limitations due to his COPD and mental impairments, it follows

24

that substantial evidence does not support his hypothetical to the VE.

## G. Credibility

Plaintiff lastly argues: "The ALJ did not follow the mandates of SSR 96-7p when determining the issues of pain and credibility." Defendant argues: "The ALJ conducted the 2-step analysis required by § 404.1529(b)-(c) and SSR 96-7p." The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The undersigned agrees with the ALJ that Plaintiff's credibility is seriously undermined by his inconsistent (even false) statements to his own doctors regarding his drug and alcohol abuse; however, because the undersigned has already found that substantial evidence does not support the ALJ's determination regarding Plaintiff's COPD, pain from gout/arthritis, and limitations due to mental impairments, the undersigned also finds substantial evidence does not support the ALJ's credibility finding.

## VI. RECOMMENDED DECISION

For the reasons above stated, the undersigned recommends Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Judgment on the Pleadings be **GRANTED in part,** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the

Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the Honorable W. Craig Broadwater, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to transmit an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _25_ day of August, 2005.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE